# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RONALD DAVID H.,[1] JR.,[2]    )
                          )
        **Plaintiff,**    )
                          )     **CIVIL ACTION**
**v.**                    )
                          )     **No. 18-2219-JWL**
**NANCY A. BERRYHILL,**    )
**Acting Commissioner of Social Security,**    )
                          )
        **Defendant.**    )
_____)

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

---

[1] The court makes all its "Memorandum and Order[s]" available online. Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

[2] In the caption to his Briefs, Plaintiff uses the middle name "Davis." However, his Complaint used the middle name "David," and the decision and record below refers to his middle name as "David." Therefore, the court has captioned this matter with "David."

## I.    Background

Plaintiff argues that the ALJ erroneously "relied on misinterpretation of factual testimony and the documented objective medical evidence, including the opinion of Plaintiff's treating physician, Dr. Bigham" (Pl. Br. 38); failed to account for limitations in concentration, persistence, or pace, and for limitations in the ability to interact with or accept criticism from supervisors in the residual functional capacity (RFC) she assessed, id. at 44-47; and failed to sustain the Commissioner's burden at step five of the sequential evaluation process.  Id. at 47-49.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether she applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). This assessment is used at both step four and step five of the sequential evaluation process. Id.

The Commissioner next evaluates steps four and five of the process--determining at step four whether, considering the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, he is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work. Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court will consider the issues in the order presented in Plaintiff's Brief. However, there is a preliminary matter which the court will address first. In his Brief, Plaintiff cited to and relied on evidence regarding arthroscopies on his left knee and on his right shoulder performed after the ALJ's decision and which evidence was provided to the Appeals Council in the first instance. (Pl. Br. 38-39).

## II.    Evidence Provided in the First Instance to the Appeals Council

The ALJ's decision in this case issued October 13, 2016. (R. 28). Plaintiff presented medical records from Atchison Hospital to the Appeals Council in support of his request for review. (R. 48-156). The Council noted that Plaintiff had submitted, and explained its consideration of, this evidence:

> You submitted medical records from Atchison Hospital dated January 1,
> 2017 through August 20, 2017 (109 pages). The Administrative Law Judge
> decided your case through October 13, 2016. This additional evidence does

4

not relate to the period at issue.  Therefore, it does not affect the decision about whether you were disabled beginning on or before October 13, 2016.

If you want us to consider whether you were disabled after October 13, 2016, you need to apply again.

(R. 2).

The Commissioner recently promulgated a regulation changing the requirements for consideration of requests for review of an ALJ's decision.  <u>Final Rule:  Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process</u>, 81 Fed. Reg. 90,987 (Dec. 16, 2016) ("compliance is not required until May 1, 2017"), <u>codified at</u>, 20 C.F.R. §§ 404.970, 416.1570 (2018) (effective Jan. 17, 2017).  This is the regulation applied by the Council in deciding Plaintiff's request for review.  (R. 1-2) ("we will review your case for any of the following reasons: … We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision.  You must also show there is a reasonable probability that the additional evidence would change the outcome of the decision.  You must show good cause for why you missed informing us about or submitting it earlier.").

The regulation provides that the Appeals Council will review a case if, among other requirements, it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. §§ 404.970(a)(5); 416.1570(a)(5) (2018).  It also provides that

If you submit additional evidence that <u>does not relate to the period on or before the date of the administrative law judge hearing decision</u> as required in paragraph (a)(5) of this section, … the Appeals Council will send you a

5

> notice that explains why <u>it did not accept the additional evidence</u> and advises you of your right to file a new application.

20 C.F.R. §§ 404.970(c), 416.1570(c) (2018) (emphases added).

That is precisely what happened here. The Appeals Council did not accept the evidence from Atchison Hospital because it "does not relate to the period at issue." (R. 2) (quoted above). Therefore, the Council did not make those records a part of the administrative record in this case, but merely included them among the Appeals Council's correspondence. (R. 48-156). This conclusion is confirmed by the fact that Plaintiff's counsel also included a representative brief with his request for review, and the Appeals Council issued an "Order of the Appeals Council" noting that it had received that additional evidence and made it a part of the record. (R. 6) (naming Exhibit B16B, "Request for Review of Hearing Decision/Order received November 23, 2016 (1 page)," and Exhibit B17E "Contentions from Roger M. Driskill, Esq. dated November 21, 2016 (3 pages)." Exhibits B16B and B17E have in fact been included within the "B" and "E" sections of the administrative record, but the hospital records have not been included as an exhibit within the "F" section of the administrative record. (R. 339, 440-41). Because the hospital records were not accepted by the Appeals Council, they are not a part of the "transcript of the record" upon which the court may rely in "affirming, modifying, or reversing the decision of the Commissioner of Social Security." 42 U.S.C. § 405(g) (sentence four). The hospital records are not a part of the administrative record and may not be considered in this court's judicial review. Moreover, Plaintiff has not sought remand pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of those records.

### III.   Misinterpretation of Factual Testimony and Objective Medical Evidence

Plaintiff claims the ALJ misinterpreted his factual testimony at the hearing, the record medical evidence, and the opinion of his treating physician, Dr. Bigham, and consequently assessed an erroneous RFC which is not supported by the record evidence. (Pl. Br. 38-44).  The Commissioner argues that the ALJ reasonably assessed an RFC based on the record as a whole.  (Comm'r Br. 5).  She argues that the court should not consider the new evidence regarding Plaintiff's left knee and right shoulder arthroscopies first presented to the Appeals Council, id. at 6-7, and addresses, respectively, the ALJ's consideration of the evidence regarding Plaintiff's left knee, right shoulder, carpal tunnel syndrome, diabetes mellitus, and spine impairments, and of Dr. Bigham's opinion, and explains how, in her view, the ALJ's understanding is reasonable and the record evidence supports that understanding.  Id. at 6-14.

In his Reply Brief, Plaintiff acknowledges that the Commissioner "disputes the relevance of evidence submitted after the ALJ issued his decision," but argues that nonetheless the evidence submitted before the ALJ's decision demonstrates that Plaintiff is disabled.  (Reply 1).  He reiterates the arguments from his Brief, id. at 1-7, and argues additionally that the ALJ did not correlate the functional limitations assessed with Plaintiff's knee impairment, id. at 2, "that, because the ALJ was under the impression Plaintiff was lying about his limitations, the ALJ did not find Plaintiff disabled," id. at 3-4, that the ALJ's "overall mindset" was impacted by his "erroneous conclusions that Plaintiff was not compliant with treatment recommendations," id. at 4, that Dr. Woodrow "did not make only 'minimal' findings" regarding Plaintiff's back impairment although

she did not recommend surgery. (Reply 5). He continues, asserting that although the Commissioner argues Dr. Bigham's opinion is inconsistent with Dr. Wallace's opinion, the ALJ accorded Dr. Wallace's opinion only some weight, and in any case, "the ALJ should have at least re-contacted Dr. Bigham." (Comm'r Br. 7).

Plaintiff's argument that the ALJ "misinterpreted" the "factual testimony and the documented objective evidence" (Pl. Br. 38) simply reflects Plaintiff's view of the evidence and asks the court to reweigh the evidence and substitute its judgment for that of the ALJ. For example, Plaintiff recognizes the ALJ's reliance on evidence of mild degeneration of, and no hospitalization for treatment of, the left knee, and argues, "While Plaintiff was not admitted, he was seen and treated in the ER for knee pain." (Pl. Pr. 38). He then cites other evidence (including the knee arthroscopy ten months after the ALJ's decision) which in his view supports a finding of disability and argues that this evidence is consistent with Plaintiff's testimony and with Dr. Bigham's opinions. Id. at 38-39. However, the ALJ found Plaintiff's allegations of symptoms were not consistent with the record evidence and explained those inconsistencies in her decision. She also explained her reasons to discount Dr. Bigham's opinions. The court finds no reversible error in these findings.

The court's review begins with the final decision of the Commissioner in all Social Security cases—here the ALJ's decision. The questions are whether she followed the correct legal standard, and whether she has relied upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401; see also, Wall, 561 F.3d at 1052; Gossett, 862 F.2d at 804. Plaintiff must

demonstrate the error in the ALJ's rationale or finding; the mere fact that there is evidence which might support a contrary finding will not establish error in the ALJ's determination. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

The court has reviewed the decision in this case, and finds it to be an unusually thorough decision, with exceptional citation to the record supporting the ALJ's decision. Rather than addressing the substance of the ALJ's decision, Plaintiff has chosen to present his (in several cases, unsupported) view of the evidence, apparently attempting to demonstrate the ALJ's "misinterpretation" of the evidence. He argues that although his shoulder "surgery took place after the ALJ issued her decision, Plaintiff testified he had been scheduled for shoulder surgery but it was delayed due to another medical condition and this was also documented in treatment records from 2015 – more than a year prior to the hearing." (Pl. Br. 39) (citing R. 173, 1410). To be sure, the record reflects Plaintiff's hearing testimony that "I was scheduled to have the shoulder surgery done and it had to be postponed because of my thyroid." (R. 173). The other record cited in Plaintiff's argument is a progress note from Dr. Bigham dated December 18, 2015. (R. 1410). It reveals that Plaintiff reported at his "Checkup for disability" that "[h]e has spinal

stenosis, low back pain with radiculopathy.  He has got a torn right shoulder, right rotator cuff that causes him difficulty with reaching. … He is having surgery on his right shoulder." (R. 1410).  Dr. Bigham assessed Plaintiff with "Right rotator cuff tear <u>or</u> <u>dysfunction</u>." <u>Id.</u> (emphasis added).  However, Plaintiff does not cite, and the court's review does not reveal any evidence in the record demonstrating that shoulder surgery was recommended, scheduled, or postponed.  In fact, on October 14, 2015, just three months <u>before</u> telling Dr. Bigham he was having surgery on his right shoulder, Plaintiff presented at the ER complaining of right shoulder pain after moving furniture and boxes for two days.  (R. 1716).  Shoulder x-rays were taken which revealed, "<u>No</u> evident acute abnormality.  <u>Mild</u> degenerative changes in the AC joint." <u>Id.</u> at 1764 (emphases added). The doctor's impression at the ER visit was, "Right shoulder strain." <u>Id.</u> at 1719.

> Moreover, the ALJ discussed both visits:
>
> The October 14, 2015 exam noted the claimant had been moving furniture for two days and developed right shoulder pain (Ex. B26F/49 [(R. 1716)]). His physical exam was normal except for right shoulder tenderness.  The claimant was oriented, alert and had a normal mood and affect (Ex. B26F/51-52 [(R. 1718-19)]).  X-rays of the right shoulder revealed mild degenerative changes in the acromioclavicular joint (Ex. B26F/97 [(R. 1764)]). … A December 18, 2015 exam noted the claimant had spinal stenosis, low back pain with radiculopathy and a right rotator cuff tear (Ex. B21F/l [(R. 1410)]).

(R. 19).  Later, she discussed Plaintiff's allegation of a right rotator cuff tear:

> The claimant indicated he has a right rotator cuff tear.  November 2014 x-rays of the right shoulder were normal (Ex. B13F/24 [(R. 809)]).  The claimant did have tenderness and decreased range of motion after he had been moving furniture for two days in October 2015 (Ex. B26F/51-52 [(R. 1718-19)]).  October 2015 x-rays noted there was mild degeneration in the acromioclavicular joint (Ex. B26F/97 [(R. 1764)]).  The December 2015 exam noted the claimant had decreased right abduction but was otherwise

unremarkable (Ex. B28F/32 [(R. 1801)]).  In December 2015, Bryon Bigham, M.D., [noted?] that, in addition to the diagnoses of spinal stenosis and low back pain with radiculopathy, the claimant carried the diagnosis of right <u>oted that</u> [sic] There are multiple physical examination[s] in the evidence of record that do not indicate the claimant had any objective medical findings regarding the right shoulder (Ex. B2F/11, B5F/21, 35, 46, 53, B6F/8, B15F/11, 67, 86, 141, 309, 407, B17F/18, B24F/26-67, B26F/9-10, 20, 56-57, B28F/5-6, 24 and B33F/7, 15, 34 and 36-37)[; (R. 458, 683, 697, 708, 715, 730, 857, 913, 932, 987, 1155, 1253, 1382, 1632, 1676, 1687, 1723-24, 1774-75, 1793, 2113, 2121, 2140, 2142-43)]. This evidence does not support the degree of functional limitation alleged by the claimant regarding his right shoulder.

(R. 21) (underline added).  Although the decision contains a typographical error when discussing Dr. Bigham's December 18, 2015 visit, it is apparent when viewing that treatment note, and in context of the ALJ's discussion of Plaintiff's "right rotator cuff tear," that in addition to the diagnoses of spinal stenosis and low back pain, Dr. Bigham diagnosed Plaintiff with "Right rotator cuff tear or dysfunction."  (R. 1410).

The ALJ is not required to accept Plaintiff's testimony, and as noted above, she found numerous inconsistencies between Plaintiff's allegations and the record evidence. As is confirmed by this discussion of the decision at issue, the ALJ clearly did not "misinterpret" the evidence.  After considering the evidence she reached a different conclusion than did Plaintiff, and her conclusion is supported by the record evidence. The court agrees with the conclusions reached by the ALJ, but even if it did not, it is without the authority to substitute its judgment for the conclusions of the ALJ which are supported by the record evidence.

The court will discuss one more (of several other) arguments which demonstrates Plaintiff's misinterpretation of the ALJ's decision.  Plaintiff points out that the ALJ erred

in summarizing Plaintiff's hearing testimony when she stated that Plaintiff testified to difficulty zipping and buttoning his clothes. (Pl. Br. 39-40). He then argues that this error led "the ALJ to conclude Plaintiff had embellished or exaggerated his allegations of disability." Id. at 40. As Plaintiff suggests, the ALJ summarized Plaintiff's allegations regarding the severity of his symptoms, including stating that Plaintiff "indicated he has bilateral carpal tunnel syndrome that causes difficulty gripping, zipping and buttoning clothes." (R. 17). As Plaintiff points out, he specifically testified that he can use his hands for doing buttons and zippers. (R. 173-74). However, the record reveals his further testimony that "sometimes I will have to have somebody come help me because I can't grip hard enough to open the jar." (R. 174). Therefore, although the ALJ erred in stating that Plaintiff has difficulty zipping and buttoning clothes, she was correct that he has difficulty gripping. Moreover, and more importantly, there is no indication that this error led her to conclude that Plaintiff had embellished or exaggerated his allegations.

As occurs in most ALJ decisions, after summarizing Plaintiff's allegations of his symptoms, in her next paragraph the ALJ began her summary of the record evidence. (R. 18). She organized her summary chronologically, beginning with a physical exam performed on January 14, 2014. Id. In that same paragraph, she summarized the record of a consultative exam performed by Dr. Koonce on June 12, 2014. "The June 12, 2014 consultative examination indicated the claimant had a very embellished neurological exam and embellished sensory exam. Aaron Koonce, D.O., noted the claimant did not have objective neurological deficits and it was doubtful the claimant had a stroke." Id. (citing Ex. B2F/8 (R. 455)). Later in the decision, when discussing Plaintiff's spinal

impairments, the ALJ again mentioned that examination. (R. 21). To be sure, Dr. Koonce's report of embellishment is an inconsistency in the record upon which the ALJ relied in discounting Plaintiff's allegations. But, that embellishment was not a conclusion of the ALJ based upon her erroneous finding that Plaintiff alleged difficulty zipping and buttoning. It was the conclusion of Dr. Koonce properly relied upon by the ALJ. That is not error.

The court will not further belabor this opinion by refuting each assertion of Plaintiff. Suffice it to say that the court finds Plaintiff has shown no reversible "misinterpretation of factual testimony and the documented objective medical evidence" in the decision below. The court will now address Plaintiff's argument that the ALJ misinterpreted Dr. Bigham's opinions.

## IV.    Dr. Bigham's Opinions

Plaintiff claims the ALJ erred in discounting the medical opinion of his primary care provider, Dr. Bigham, because an "ALJ is not permitted to rely on her own personal observations at the hearing," and by doing so has overstepped her bounds into the province of medicine. (Pl. Br. 42). He also claims the ALJ erred in equating household chores to employment, id. at 43, and that she "did not consider even most of the regulatory factors" for evaluating medical opinions. Id. at 44. The Commissioner argues that the ALJ provided reasons to discount Dr. Bigham's opinion which were legitimate and supported by the record evidence. She asserts that Dr. Bigham opined Plaintiff has severe functional limitations, and that fact is "[c]ritical to the ALJ's reasoning in this

case." (Comm'r Br. 12). The Commissioner cites to additional record evidence which she asserts is supportive of the decision to discount Dr. Bigham's opinion. Id. at 13.

## A. The ALJ's Findings

The ALJ considered, summarized, and explained the weight accorded several medical opinions. (R. 24-25). The ALJ accorded significant weight to the opinions of the state agency medical and psychological consultants regarding Plaintiff's application for DIB because they were consistent with the ALJ's decision on Plaintiff's prior application and there was no additional evidence presented in this case dated before Plaintiff's date last insured for DIB. (R. 24). She accorded some weight to the opinion of the psychological consultant, Dr. Blum, regarding Plaintiff's mental limitations after his date last insured on his application for SSI benefits "because the medical evidence received at the hearing indicates the claimant is better suited for simple, repetitive, routine work rather than intermediate work." Id. As for the opinion of the state agency medical consultant, Dr. Coleman, regarding Plaintiff's physical limitations after his date last insured on his application for SSI benefits, the ALJ accorded significant weight but also noted that "based upon the evidence received at the hearing level, including the claimant's testimony, additional nonexertional limitations are warranted." Id.

The ALJ accorded some weight to the opinion of the consultant examiner, Dr. Wallace, noting that "the record does not support that the claimant's sitting ability is as limited as alleged." Id. She accorded partial weight to the opinion of the psychological consultant who examined Plaintiff, Dr. Wells, "because the evidence received at the hearing level, including the claimant's testimony and evidence at B34F [(R. 2150-72)],

indicate that the claimant's social functioning is more limited than described in [Dr. Wells's] opinion." (R. 25). She also noted that the records included Global Assessment of Functioning (GAF) scores, and explained she accorded little weight to those scores because they describe Plaintiff's level of functioning for a brief period; do not specify limitation in functioning, symptoms or both; are not a standardized measurement, and have been deleted from use in the fifth edition of the <u>Diagnostic and Statistical Manual of Mental Disorders</u>.

In her evaluation of the medical opinions, the ALJ recognized that Dr. Bigham had provided two opinions, and summarized and weighed both:

> On June 16, 2014, Bryon Bigham, M.D., indicated that the claimant is unable to work in a competitive work environment (Ex. B3F/2 [(R. 470)]). Little weight is given to this opinion because Dr. Bigham does not refer to evidence that supports his opinion; instead, he merely makes a conclusory opinion. Moreover, whether the claimant is unable to perform competitive work is a determination reserved to the Commissioner of the Social Security Administration (SSR [(Soc. Sec. Ruling)] 96-5p).

(R. 24).

> On December 18, 2015, Dr. Bigham, noted the claimant could perform less than the full range of sedentary work, would need a 30 minute break every hour and would be absent from work more than four times a month (Ex. B21F/1 [(R. 1410)]). Dr. Bigham completed a physical medical source statement that indicated the claimant could perform less than the full range of sedentary work, would need a 30 minute break every hour, cannot stand or walk or sit for even an hour in an eight hour workday and would be absent from work more than four days a month due to his impairments or treatment (Ex. 19F/l-2 [(1404-05)]). I give little weight to these opinions because the limit to no standing, walking or siting [sic] is unreasonable given that the claimant is not bedridden, he sat through the hearing, and he testified to having no problems with his personal care or cooking for himself, along with doing some light household chores. The claimant's described abilities are not consistent with this opinion.

(R. 25).

## B.      Legal Standard for Weighing Medical Opinions

For claims filed before March 17, 2017, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources[3] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.  Id. §§ 404.1527(c), 416.927(c); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 124-25 (Supp. 2018).  A physician who has treated a patient frequently over an extended period (a treating source) is expected to have greater insight into the patient's medical condition, and his opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's

---

[3]The regulations define three types of "acceptable medical sources:"

"Treating source:" an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:" an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:" an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)). However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 110-14 (Supp. 2018) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p). The ALJ first determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" Id. at 1300 (quoting SSR 96-2p). If the opinion is well-supported, the ALJ must confirm that the opinion is also consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

If the treating source opinion is not given controlling weight, the inquiry does not

end.  Id.  A treating source opinion is "still entitled to deference and must be weighed

using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Id.  Those

factors are:  (1) length of treatment relationship and frequency of examination; (2) the

nature and extent of the treatment relationship, including the treatment provided and the

kind of examination or testing performed; (3) the degree to which the physician's opinion

is supported by relevant evidence; (4) consistency between the opinion and the record as

a whole; (5) whether or not the physician is a specialist in the area upon which an opinion

is rendered; and (6) other factors brought to the ALJ's attention which tend to support or

contradict the opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(c)(2-6), 416.927(c)(2-6); see

also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v.

Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

After considering the factors, the ALJ must give reasons in the decision for the

weight he gives the treating source opinion.  Id. 350 F.3d at 1301.  "Finally, if the ALJ

rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing

so."  Id.  (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v.

Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

**C.**      **Analysis**

Plaintiff's argument that an "ALJ is not permitted to rely on personal observations

at the hearing" (Pl. Br. 42), is without support.  Of course an ALJ may rely, at least in

part, on her observations at the hearing to determine if Plaintiff's allegations are

consistent with his actions and abilities.  E.g., Wilson, 602 F.3d at 1146 (accepting the

ALJ's finding that the plaintiff's claim she was limited to sitting thirty minutes was "inconsistent with the fact that, during the sixty-five-minute hearing, the ALJ noticed no position alteration or obvious discomfort").  The cases cited by Plaintiff are not to the contrary.  Walker v. Callahan, 990 F. Supp. 1283, 1286 (D. Kan. 1997) (quoting Ludden v. Bowen, 888 F.2d 1246, 1249 (8th Cir. 1980) ("Subjective complaints of pain may not be rejected solely on the basis of the ALJ's personal observations.") (underline added).  The court is unable to discern any relation between the case of Bolan v. Barnhart, 212 F. Supp 2d 1248, 1262 (D. Kan. 2002), and the proposition asserted.  While Plaintiff is correct when he asserts that the hearing was conducted by video, and the ALJ's view was undoubtedly limited in some respects, Plaintiff provides no reason to disbelieve the ALJ's finding that Plaintiff "sat through the hearing."  (R. 25).  Although the ALJ may have been unable to "observe whether Plaintiff had his feet elevated or was shifting his lower body in the seat, etc," that is no reason to believe she did not observe Plaintiff sitting throughout the hearing.  Moreover, the court sees no basis to determine this finding resulted from the ALJ's overstepping her bounds into the province of medicine, as Plaintiff suggests.

While Plaintiff is correct that "[i]n the Tenth Circuit, the performance of household tasks does not establish that a person is capable of engaging in substantial gainful activity" (Pl. Br. 43), the ALJ did not make such a determination in this case.  Rather, as quoted above, she found that Plaintiff's testimony of "no problems with his personal care or cooking for himself, along with doing some light household chores," is

inconsistent with Dr. Bigham's opinion that Plaintiff "cannot stand or walk or sit for even an hour in an eight hour workday." (R. 25).

Finally, Plaintiff's argument that "[t]he ALJ did not consider even most of the regulatory factors" in evaluating Dr, Bigham's opinion is without merit. (R. 44). Primarily, Plaintiff seems to confuse the requirement for an ALJ to <u>consider</u> the regulatory factors with a requirement (which does not exist) to <u>discuss</u> each of the regulatory factors with regard to each medical opinion. The ALJ stated she had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p" (R. 17), and Plaintiff provides no basis to find otherwise. Before evaluating each opinion in her decision, the ALJ reiterated the requirement, cited the regulation in which the requirement is contained, and specifically named seven regulatory factors she had considered in weighing the medical opinions. (R. 23-24). The courts general practice is to take a lower tribunal at its word when it declares that it has considered a matter. <u>See</u> <u>United States v. Kelley</u>, 359 F.3d 1302, 1304-05 (10th Cir. 2004) (district court must consider certain factors before imposing prison time for probation violation, but court need only say that it has done so); <u>cf.</u> <u>Andrews v. Deland</u>, 943 F.2d 1162, 1170 (10th Cir. 1991) (refusing to "look behind a district court's express statement that it engaged in a <u>de novo</u> review of the record"). Plaintiff provides no basis for the court to depart from its general practice in this case. Moreover, the court has explained that an ALJ need not provide a factor-by-factor analysis so long as the "ALJ's decision [is] 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight.'" Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting Watkins, 350 F.3d at 1300). The court finds no error in the ALJ's evaluation of Dr. Bigham's opinions.

## V. Mental RFC Assessment

Plaintiff claims that the ALJ's mental RFC does not adequately account for the moderate difficulties in maintaining concentration, persistence, or pace the ALJ assessed at step three of the sequential evaluation process. (Pl. Br. 44-45). He also claims the ALJ's assessment of limitations to no interaction with the public and only occasional interaction with co-workers does not adequately account for her finding of moderate difficulties maintaining social functioning because it did not include a limitation on interaction with supervisors and failed to include an explanation why she did not limit interaction with supervisors. Id. at 45-47.

The Commissioner argues that the ALJ adequately accounted for the moderate limitations assessed in determining the severity of Plaintiff's mental impairments at steps two and three of the sequential evaluation process. She points out that the ALJ noted the Paragraph B criteria used to rate whether a mental impairment is severe within the meaning of the regulations are not a mental RFC assessment and that her mental RFC assessment reflects the degree of limitation she found when considering the Paragraph B criteria. (Comm'r Br. 14). She argues that the mental RFC adequately accounts for both the moderate difficulties in concentration, persistence, or pace; and the difficulties in social functioning found at step three of the evaluation process. Id. at 15-16.

### A. Legal Standard for Assessing Mental RFC

The Commissioner has promulgated a Psychiatric Review Technique for evaluating mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a (2016). In evaluating the severity of mental impairments at steps two and three, the technique provides for rating the degree of functional limitation in each of four broad mental functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. §§ 404.1520a(c) 416.920a(c). After rating the degree of limitation in each functional area, the Commissioner determines the severity of Plaintiff's mental impairments. Id. §§ 404.1520a(d), 416.920a(d).

When the first three functional areas are rated as "none" or "mild," and the fourth area is rated as "none," the agency will conclude at step two of the sequential evaluation process that Plaintiff's mental impairments are not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [Plaintiff's] ability to do basic work activities." Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

If the mental impairments are severe, the technique requires an evaluation of whether the impairment meets or equals a listed mental impairment by comparing the step two findings and the medical evidence with the criteria of the listings. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). The four broad mental functional areas are also used in defining the Paragraph B criteria of most of the Listings of mental disorders. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00C; see also, § 12.00A (all mental disorder Listings except 12.05 and 12.09 contain the Paragraph B criteria). If the Commissioner determines that Plaintiff's mental impairments do not meet or equal a Listing, he will then assess Plaintiff's RFC. Id. §§ 404.1520a(d)(3), 416.920a(d)(3).

In determining RFC, the regulations provide that the Commissioner will consider Plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work." Id. §§ 404.1545(a)(4), 416.945(a)(4). The regulations provide that "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [Plaintiff's] ability to do [work.]" Id. §§ 404.1545(c), 416.945(c).

The Commissioner has clarified the difference between evaluating the severity of mental limitations at steps two and three of the evaluation process based upon the four broad functional areas identified in the psychiatric review technique and assessing mental RFC. SSR 96-8p, West's Soc. Sec. Reporting Serv., Rulings 146 (Supp. 2018). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the four functional areas. Id. RFC must be expressed in terms of specific work-related functions. Id. at 147. "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." Id. at 148. Therefore, an ALJ should not state a mental RFC in terms of the four functional areas, but should make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand. Id. at 144.

**B.** **The ALJ's Findings**

As relevant to evaluating Plaintiff's mental impairments and assessing RFC, the ALJ made the following findings. In her step two and three assessment, the ALJ found that Plaintiff has mild restrictions in activities of daily living and no episodes of decompensation of extended duration. (R. 15-16). She found that Plaintiff has moderate difficulties in social functioning, specifically mentioning evidence that Plaintiff reported in September 2014 and July 2015 that he has no problem getting along with others, and that he is able to interact satisfactorily with medical providers and consultative examiners. (R. 15). She found he has moderate difficulties with concentration, persistence, or pace, and mentioned Plaintiff's reports in September 2014 that "he can drive but does not have a car, pays bills, handles money and needs no reminders," and in July 2015 that "he prepares daily meals, drives, pays bills, handles money and needs no reminders." Id. She concluded that his mental impairments are severe, id. at 13, but that they do not meet or medically equal a Listing even when considering the Paragraph C criteria. Id. at 16. She specifically noted that her assessment in accordance with the Paragraph B criteria is not an RFC assessment but that she would do a more detailed assessment by considering various individual mental functions. Id. She stated that "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." Id.

In her RFC the ALJ assessed the following mental limitations:

"He is limited to performing simple, routine, and repetitive tasks, which may require detailed instructions but do not involve complex tasks. He should have no interaction with the public, but he can work around co-workers but with only occasional interaction with co-workers."

(R. 16-17) (finding no. 5) (bold omitted). The narrative discussion of the RFC included the standards the ALJ applied in evaluating Plaintiff's allegations of symptoms and in evaluating the opinion evidence. Id. at 17, 23-24. She summarized the record evidence, discussed the factors she found relevant in evaluating Plaintiff's statements of symptoms, and evaluated the opinions in the record. Id. at 17-26. In summarizing the record evidence, the ALJ included summaries of mental status examinations which included information regarding Plaintiff's orientation, alertness, mood, affect, memory, evidence of psychosis, evidence of reasonableness of responses, behavior, speech, judgment, thought process and content. Id. at 18-20.

The ALJ specifically summarized Plaintiff's mental health progress notes:

In the June 9, 2016 initial mental health progress note the claimant reported he had applied of disability [sic] three times and was denied (Ex. B34F/9 [(R. 2158)]). His mental status exam was unremarkable except for reporting an up and down mood and affect (Ex. B34F/11 [(R. 2160)]). The claimant denied having suicidal or homicidal ideation, auditory or visual hallucinations or prior suicide attempts (Ex. B34F/12 [(R. 2161)]). On July 14, 2016 the claimant's mental status exam was unremarkable (Ex. B34F/21 [(R. 2170)]).

Id. at 20-21. She discussed the evidence regarding Plaintiff's mental impairments:

As for the claimant's mental impairments, the claimant had multiple mental status examinations that indicated he was oriented, alert and had a normal mood, affect, behavior, judgment and thought process and content (Ex. B5F/21, 46, 53, B6F/3, 8, B8F/2-4, B12F/4-5, B13F/3-4, B15F/141, 216, 229, 407, B17F/18, B24F/26-27, B26F/9-10, 20, 51-52, 76, B28F/5-6, 24, 32, 49, 57, B31F/45, B33F/7, 15, 36-37 and B34F/21 [(R. 683, 708, 715, 725, 730, 751-53, 771-72, 788-89, 987, 1062, 1075, 1258, 1382, 1632-33, 1676-77, 1687, 1718-19, 1743, 1774-75, 1793, 1801, 1818, 1826, 2073, 2113, 2121, 2142-43, 2170)]). The March 2015 consultative mental examination notes the claimant was not taking any psychotropic medication and had not taken any medication to treat a mental health problem. He reported no prior or current mental health problems. The claimant reported

25

he was able to get along with supervisors and co-workers in past employment and had no mental health issues that impacted his prior performance on the job. The mental status exam was unremarkable (Ex. B11F/1-7 [(R. 759-65)]). In February 2016 the claimant indicated he had been caring for a sick family member (Ex. B26F/73 [(R. 1740)]). The June 2016 exam noted the claimant had not been in follow-up treatment for a year and a half (Ex. B34F/8 [(R. 2157)]). In July 2016 the claimant reported he gets panic attacks in public places but stated he recently went to the casino and won $50.00. He indicated his mood was better after he began taking medication again, had an improved energy level and experienced no suicidal or homicidal ideation, hallucinations or hypomanic or manic symptoms (Ex. B34F/20 [(R. 2169)]). This evidence is not consistent with the claimant's allegations regarding the intensity, persistence and limiting effects of his mental symptoms and their impact upon his ability to work.

(R. 22).

The ALJ explained the weight she accorded to the medical opinions of the psychologists contained in the record. She accorded significant weight to the opinions of the state agency psychological consultant, Dr. Blum, regarding Plaintiff's application for DIB, because it was consistent with the ALJ's decision on Plaintiff's prior application and there was no additional evidence presented in this case dated before Plaintiff's date last insured for DIB. (R. 24). She accorded some weight to the opinion of Dr. Blum regarding Plaintiff's mental limitations after his date last insured on his application for SSI benefits "because the medical evidence received at the hearing indicates the claimant is better suited for simple, repetitive, routine work rather than intermediate work." Id. She explained her consideration of the medical opinion of Dr. Wells, the psychologist who examined Plaintiff at the request of the state agency:

The March 30, 2015, consultative examiner Dr. Wells opined that the claimant would likely have no difficulty performing simple, repetitive tasks, would likely be suited for more repetitive tasks and have more

difficulty with complex tasks requiring him to frequently remember information, appears capable of making basic decisions and his level of reasoning and judgment would not negatively impact work related decisions and would be able to understand and apply instructions and carry out work related tasks in the workplace consistent with average intellectual functioning. He further opined that the claimant would have a mildly impaired ability to respond appropriately to supervisors and co-workers in a work setting, appeared able to interact appropriately, had no limitation in conforming to social expectations in work setting and mild difficulty responding appropriately to workplace pressures (Ex. B11F/3-7 [(R. 761-65)]). I give partial weight to this opinion because the evidence received at the hearing level, including the claimant's testimony and evidence at B34F [(R. 2150-72)], indicate that the claimant's social functioning is more limited than described in this opinion.

(R. 24-25).

She also concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Id. at 26.

## C.    Analysis

Plaintiff has demonstrated no error in the ALJ's assessment of his mental RFC. Plaintiff is correct that the ALJ found at steps two and three that Plaintiff has moderate difficulties in social functioning and in concentration, persistence, and pace. (R. 15). However, she also explained that these are two of the four broad areas of mental functioning (the Paragraph B criteria) used by the Social Security Administration to evaluate whether a mental impairment is severe within the meaning of the Act and regulations at step two of the evaluation process and whether it is severe enough to meet or medically equal the severity of a Listed impairment at step three of the process, but

27

that it is not a residual functional capacity assessment, which requires consideration of specific mental functional abilities to determine specific mental limitations which will be applied in determining whether a claimant is able to perform his past relevant work at step four of the process or whether he is able to perform other work available in the economy at step five of the process.

Plaintiff attempts to equate moderate limitations in these two broad mental functional areas with theoretical (but unnamed) mental functional limitations allegedly greater than those assessed by the ALJ in this case, but he cites to no record evidence demonstrating that Plaintiff has additional and greater limitations. Rather, he cites to unpublished opinions of the Tenth Circuit and to district court opinions, in an apparent attempt to get this court to reweigh the ALJ's evaluation, and substitute a judgment that the Paragraph B criteria require some unstated greater mental limitations than those assessed by the ALJ. (Pl. Br. 44-45); (Reply 8-9). As noted previously in this opinion, the court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Moreover, none of the cases cited by Plaintiff are precedent, binding on this court, and Plaintiff provides to explanation how or why the cases cited are persuasive and apply to the facts and evidence present in this case.

Plaintiff's argument regarding social functioning provides a more judicially reviewable question for the court because he notes that competitive work requires the ability to respond appropriately to supervision, co-workers, and usual work situations, and that the ALJ limited Plaintiff to no interaction with the public, and only occasional interaction with co-workers, but provided no limitation on interaction with supervisors.

As Plaintiff's Brief suggests, the ALJ found Plaintiff "should have no interaction with the public" and "can work around co-workers but with only occasional interaction with co-workers." (R. 17) (bold omitted).

These findings are consistent with Dr. Blum's opinion that Plaintiff is moderately limited in the ability to interact appropriately with the general public, but not significantly limited in the abilities to respond to criticism from supervisors, and to get along with coworkers. (R. 241). Dr. Blum explained that Plaintiff's "[l]evel of social behavior was generally acceptable. He described no difficulty dealing with coworkers and supervisors in the past. Only mild limitations in social domain based on his mental health issues were anticipated." Id. at 242. Dr. Blum noted Plaintiff's "anxieties in regard to large groups of people may reduce his capacities to deal with the general public," id. at 243, and that Dr. Wells's report suggested "[d]ealing with coworkers and supervisors were not viewed as being a substantial difficulty." Id. at 242. This is also consistent with Dr. Wells's report, which explained that Plaintiff's " level of social behavior during the examination was generally acceptable," that he "reported he does not like to be around crowds," that he "described no difficulty in dealing with coworkers and supervisors in the past," that "[h]is ability in responding appropriately to supervision and to coworkers in the work setting appears to be mildly impaired," that "[n]o limitations to conform to social expectations in a work setting were noted," and that "[h]e reported no history of mental or emotional deterioration in response to workplace exposure." (R. 764).

The ALJ accorded some weight to Dr. Blum's opinion, discounting it only to the extent that "the medical evidence received at the hearing indicates the claimant is better

suited for simple, repetitive, routine work rather than intermediate work." (R. 24). Thus, she accepted Dr. Blum's opinion that Plaintiff's capacity to work around the public was reduced. She also accorded partial weight to Dr. Wells's opinion that Plaintiff "would have a <u>mildly</u> impaired ability to respond appropriately to supervisors and co-workers in a work setting, appeared able to interact <u>appropriately</u>, had <u>no</u> limitation in conforming to social expectations in work setting and <u>mild</u> difficulty responding <u>appropriately</u> to workplace pressures." <u>Id.</u> at 25 (emphases added). Given Plaintiff's report that he had no difficulty dealing with supervisors in the past, and the opinions of Dr. Blum and Dr. Wells, and in light of the facts as summarized in the ALJ's decision, the determination that Plaintiff should <u>not interact</u> with the public and <u>only occasionally interact</u> with co-workers is supported by substantial record evidence, but Plaintiff has not shown that this evidence requires a specific limitation on <u>interaction with supervisors</u>. While the ALJ might have found a greater limitation in this regard the evidence does not require it and the court may not interpose its judgement in such a case. <u>Lax</u>, 489 F.3d at 1084.

## VI. Step Five

Plaintiff points out that the ALJ found Plaintiff is limited "to standing and/or walking 4 hours of an 8-hour workday," and argues that light work "requires the ability to stand and/or walk 6 hours of an 8-hour workday." (Pl. Br. 47) (citing R. 16-17, and SSR 83-10). She argues that this discrepancy represents a conflict between the testimony of the vocational expert (VE) and the <u>Dictionary of Occupational Titles</u> (DOT) which was not resolved by the ALJ, and consequently the ALJ erred in relying on the VE's testimony. (Pl. Br. 47-48). The Commissioner responds that the ALJ reasonably relied

upon the VE testimony and that "[w]hile an individual must be able to stand/walk up to six hours per day in order to perform <u>all</u> occupations existing at the light exertional level, this is a maximum requirement and not all light jobs require this maximum." (Comm'r Br. 17).

As the Commissioner suggests, Plaintiff has not shown a conflict between the VE testimony and the DOT, thereby requiring a resolution by the ALJ. The DOT defines "light work:"

> **Light Work** - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

<u>Dictionary of Occupational Titles</u> (4th Ed., Rev. 1991) (App. C), <u>available online at,</u>

<u>https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM</u> (last visited, March 1, 2019). In accordance with the DOT definition, light work requires only "walking or standing to a <u>significant</u> degree." Therefore, it does not <u>require</u> the ability to stand and/or walk 6 hours of an 8-hour workday as Plaintiff argues.

SSR 83-10 does not require a different result. Its definition of light work is substantially the same as that in the DOT:

> Light work. The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a <u>particular</u> light job may be very little, a job is in this category when it requires <u>a good deal of walking or standing</u>--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

<u>Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2</u>, SSR 83-10 (S.S.A. 1983), 1983 WL 31251, at *5 (emphases added). By this definition, light work <u>requires</u> only <u>a good deal of walking or standing</u>. While SSR 83-10 goes on to note that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," <u>id.</u>, 1983 WL 31251 at *6, the ALJ in this case did not find that Plaintiff is capable of performing the <u>full range</u> of light work. Rather, she found that he is capable of standing and/or walking only up to four hours total in an eight-hour workday (R. 16), and based on the RFC assessed and the testimony of the VE, that he is able to perform jobs existing in the economy represented by "occupations such as an electronics assembler (DOT# 729.684-054 and 55,000 jobs nationally); router (DOT# 222.587-038 and 76,000 jobs nationally); and bench assembler (DOT# 706.684-042 and 86,300 jobs nationally)." (R. 27). Because Plaintiff has not shown a conflict between the DOT and the testimony of the VE, there was nothing in the decision requiring explanation by the ALJ, and Plaintiff has shown no error in the ALJ's reliance on the VE testimony.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the

fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated March 1, 2019, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**